## CHARLES H. POTTER v. JOHN H. SHUTE, JR.

Middle Section.   January 28, 1928.

William Hume and James A. Newman, of Nashville, for plaintiff in error.

Edwin A. Price, Thos. W. Schlater, Jr., and Edwin A. Price, Jr., of Nashville, for defendant in error.

FAW, P. J.. The defendant in error, John H. Shute, Jr., was seriously and permanently injured on August 18, 1926, as the result of a collision between two automobiles, one of which was owned and

driven by him and the other was owned and driven by the plaintiff in error Charles H. Potter.

Shute sued Potter for $25,000 as damages on account of his aforesaid injuries, and a jury in the Third Circuit Court of Davidson county returned a verdict by which they found the issues (made by Potter's plea of not guilty to plaintiff's declaration) in favor of Shute and fixed his damages at $13,500.

On motion for a new trial, the Circuit Judge suggested a remittitur of $2500, which was accepted by Shute under protest, and thereupon the motion for a new trial was overruled. Defendant Potter prayed, obtained and perfected an appeal in the nature of a writ of error and has assigned errors in this court. Plaintiff Shute prayed and was granted an appeal in error from the action of the trial court in entering a remittitur of $2500, but he did not perfect his appeal and is not now complaining of the remittitur.

For convenience, we will designate the parties herein as plaintiff and defendant, respectively, as they appeared on the record in the circuit court.

The defendant's assignments of error present but two questions, viz: (1) that there is no evidence to support the verdict and judgment, and (2) that the verdict is so excessive as to indicate passion, prejudice and caprice on the part of the jury.

There is one other assignment of error (the second), through which the defendant says that the evidence greatly preponderates against the verdict of the jury; but, under well settled rules, this assignment cannot be considered. Railroad v. Abernathey, 106 Tenn., 722, 728, 64 S. W., 3.

But defendant's counsel (two excellent lawyers, ranking among the ablest and most learned of the lawyers practicing at the bar of this court) have seen fit to insist upon the second assignment of error, viz: that the evidence greatly preponderates against the verdict. In the outset of their typewritten argument filed with and in support of the defendant's assignments of error, counsel say that "assignments Nos. One and Two will be discussed together," and they thereupon proceed to state the testimony of the witnesses, and certain deductions and inferences which they draw therefrom, for the avowed purpose of demonstrating the truth of their insistence that the plaintiff Shute was guilty of negligence which proximately contributed to his injuries; and they argue that certain of the plaintiff's witnesses are unworthy of belief, and that (in certain particulars wherein there are material conflicts of testimony) the physical facts disclosed by the record support the defendant and his witnesses rather than the plaintiff and his witnesses.

By thus commingling the discussion of the first and second assignments of error in the manner stated, and in failing to point out undisputed evidence of contributory negligence on the part of plain-

tiff, counsel for defendant have, in large measure, deprived the court of any benefit from their argument. The jury is the judge of the credibility of the witnesses, and, in case of conflict of testimony, it was for the jury to accept or reject the testimony of any witness, in whole or in part, and also to determine whether, upon the whole proof, the testimony of any witness should be rejected on the ground that it was inconsistent with established physical facts.

We do not mean to be understood as holding that the appellate court would be bound by a jury verdict based on nothing but testimony utterly inconsistent with well known and generally accepted natural laws; but this record does not present a case of that character.

"The question of contributory negligence, as well as the question of negligence, is ordinarily for the jury. Even though the facts be undisputed, if intelligent minds might draw different conclusions as to whether, under circumstances conceded, the conduct of plaintiff was that of an ordinarily prudent man, the matter should be left to the jury. The court should draw no inference when in doubt, but only in those cases where the evidence is without material conflict, and such that all reasonable men must reach the same conclusion therefrom. It is only in cases where the evidence is susceptible of no other fair inference that the court is justified in instructing the jury, as a matter of law, that the plaintiff has been guilty of contributory negligence which would bar his recovery." Roofing & Mfg. Co. v. Black, 129 Tenn., 30, 36, 164 S. W., 1183. See, also, Studer v. Plumlee, 130 Tenn., 517, 519, 172 S. W., 305, and Hines v. Partridge, 144 Tenn., 219, 235, 231 S. W., 16, and other cases therein cited.

There is no occasion to extend this opinion by reviewing the testimony of the witnesses or stating the facts in detail. This is not a case where a "finding of facts" by this court would be of benefit to the parties, as the question presented by defendant's first assignment of error is, whether there is any material evidence to support the verdict of the jury, and our answer to that question is a conclusion of law which may be reviewed by the Supreme Court upon the whole record.

There was evidence before the jury supporting the averments of plaintiff's declaration that while plaintiff was driving in a westerly direction along the Harding Road near its intersection with Wilson avenue, at a moderate rate of speed, viz: ten or twelve miles an hour, on his right hand side of the traveled portion of Harding Road, and defendant was driving a large and highpowered automobile in a negligent, careless and reckless manner, at a high and unlawful rate of speed, viz: thirty-five or forty miles an hour, in an easterly direction along the same highway, the defendant, without slowing down or making any reasonable effort to do so, suddenly and quickly swerved his automobile from the southerly side of said

Harding Road in a negligent and careless attempt to pass other automobiles parked or standing along or near the southerly side of said road and drove diagonally across said road in a northeasterly direction to his, the defendant's, left side of the paved and traveled part of said road and negligently ran and drove his automobile into and against the small chevrolet automobile in which plaintiff, in the exercise of due care, was then and there driving as aforesaid with great force and violence, whereby and as a result of which collision, plaintiff's car was turned over two or three times and plaintiff was thereby hurled with great force and violence out of his said automobile and had inflicted upon him serious and permanent injuries (which injuries are described in the declaration and shown by the proof.)

It is further averred that the negligent, reckless, and unlawful acts of the defendant as aforesaid were the sole and proximate cause of the injuries thus inflicted upon plaintiff by defendant.

There was also evidence before the jury, from the defendant and his witnesses, tending to show that plaintiff was driving his car at an unlawful rate of speed and did not exercise ordinary care to avoid the collision. If this latter testimony contains the truth of the case, plaintiff is not entitled to recover; but the verdict implies that the jury rejected the defendant's testimony and accepted the testimony for plaintiff on these material facts, and we are bound by the verdict of the jury. Lumber Co. v. Blanks, 118 Tenn., 627, 631, 102 S. W., 79; Continental Insurance Company v. Schulman, 140 Tenn., 481, 486, 205 S. W., 315; Fairbanks v. Gambill, 142 Tenn., 633, 641, 222 S. W., 5; Nashville Railway & Light Co. v. Overby, 143 Tenn., 581, 583, 223 S. W., 997; Railroad v. Leazer, 119 Tenn., 1, 107 S. W., 684. The defendant's first assignment of error is overruled.

The remaining question is whether the verdict is so excessive as to indicate passion, prejudice and caprice on the part of the jury.

As before stated, the verdict of $13,500 was reduced by remittitur below to $11,000. The amount of damages to which the plaintiff is entitled in a personal injury action is primarily a question for the jury, and it is not within the province of an appellate court to substitute its judgment for that of the jury and the trial judge. However, the appellate courts have power to require a remittitur as a condition of affirmance if, in their opinion, the judgment is so excessive as to show passion, prejudice, caprice or corruption on the part of the jury. Grant v. Railroad, 129 Tenn., 398, 165 S. W., 963.

The plaintiff is a young negro man twenty-six years of age, with an expectancy of thirty-eight years. He was married and was supporting his wife at the time he was injured. He was then working as a butler and houseboy at a salary of $15 per week in a position which he had held for more than two years theretofore. The

nature and extent of his injuries are shown by the undisputed testimony of Dr. T. D. McKinney, which is in full as follows:

"By Mr. Price:

"Q. This is Dr. T. D. McKinney? A. Yes, sir.

"Q. What is your profession? A. Surgeon.

"Q. Are you a graduate of some medical college? A. Yes, sir. Vanderbilt, 1913.

"Q. A graduate in medicine and surgery? A. Yes, sir.

"Q. Have you been engaged in the practice of your profession since your graduation, thirteen years ago? A. Yes, sir.

"Q. Where, Doctor? A. In Nashville.

"Q. During that time have you practiced medicine and surgery in Nashville? A. Yes, sir.

"Q. Were you engaged in that profession and in that practice in connection with Vanderbilt Hospital in August, 1926. A. Yes, sir.

"Q. In what particular department were you engaged at that time? A. In the department of surgery.

"Q. Were you there on the morning of ¡August 18th, 1926? A. Yes, sir.

"Q. Do you recall that the plaintiff, John Shute, this boy you see on the cot here, before you, was brought to that hospital? A. Yes, sir.

"Q. Did you examine and treat him, Doctor? A. Yes, sir, I did.

"Q. Just tell the court and jury in plain words, we are all laymen, and would like for you to avoid technical words as much as possible so as to give us a definite understanding and describe as plainly as you can, the nature and extent of his injuries. A. I first saw this patient about ten or eleven o'clock I presume. He was in the X-ray room at that time having an X-ray picture made of his spine. He had been previously sent to the emergency ward and scalp wound had been closed or sutured.

"The Court: By sutured, you mean, sewed up? A. Yes, sir, Dr. Brooks, the professor in charge of this man, because I have the surgery of the nervous system, brain, spinal column and nerves that come into Vanderbilt Hospital, and for that reason I was asked to take charge of this man. We found, in addition to the scalp wound, and other minor bruises about his body, that he had an injury to his spine about at the attachment of the last rib, and the lower part of the chest. This could be felt from the outside, there was a prominence of the bones standing out at that place, very prominent and very tender, but there was no open wound at that point.

"The X-ray indicated that the bones of the spine were broken, and the displacement of the bone, the lower segment or section of the spine displaced backward and the upper section displaced forward to the very marked extent, probably an inch or an inch and a half.

"There was also a displacement to the side from a picture made from front to back. On examination he was found to be completely paralyzed from this level, or his entire body from the supply of nerves coming off below this point of injury and was completely paralyzed, he had no power of motion and no sensation, that is, he could not feel below that point. Stick him with a pin or sharp instrument without any feeling at all below the level of the injury.

"We later carried him to the operating room in order to explore and see if there was any chance of relieving the pressure on the spinal cord. On making an incision into the skin, in the middle of his back, over this prominent bone, we immediately encountered torn bloody muscles, the muscles of the back were all torn and blood clot, and in going down towards the bone, encountered pieces of white spinal cord tissue that had been thrown out near the skin, out into this torn muscle. On going down into the wound, deeper, we found this bone, the one that had been presented prominently, to be broken in several places. Its attachment where it fastens to the other bone was broken, body or arch that surrounds the spinal cord was broken in several places. Its attachment where it fastens to the other bone was broken, body or arch that surrounds the spinal cord was broken, and some of the smaller projections of bone, one above and one below, this twelfth dorsal, the last rib which was attached, was the one so badly displaced, and so badly broken on going on down to the spinal cord, we found the covering of the cord, which is thick, and tough, the membrane was torn and lacerated spinal tissue was oozing from this torn place.

"On further examination we found the cord completely cut in two, a section of it was missing, to the extent of a half to three-quarters of an inch, so of course there was nothing to be done towards covering that, and the hemorrhage was stopped and the wound closed and he was sent back to his room."

By Mr. Price:

"Q. Now, Doctor, before you pass from that examination, I will ask you, where the backbone was completely broken in two, you say about the twelfth vertebra? A. We speak of it as the twelfth dorsal. It is the last one that has a rib attached to it.

"Q. And that was completely broken and was it at that point that the spinal cord had been severed? A. Yes, sir.

"Q. And the substance of the spinal cord was oozing out, as you expressed it? A. Yes, sir.

"Q. Now, at other places on the back bone, other than the twelfth dorsal bone, was the vertebrae crushed or broken? A. Yes, I mentioned that the one above and the one below had some of the little articular processes, or branches that articulate, where they are joined above and below.

"Q. Then there were two on which the articular processes were broken and between the twelfth and the thirteenth. A. Yes, sir, the one below.

"Q. Between the twelfth and the one below, the bone was broken in two? A. Yes, sir.

"Q. Now, Doctor, state whether or not that is a permanent injury? A. It is.

"Q. Will he ever recover from it? A. No, sir.

"Q. Is there any hope for him to recover from those injuries? A. No, sir.

"Q. From your examination and operation and diagnosis at that time, did you expect that he would have any protracted tenure of life, live any particular time? A. It is difficult to estimate just how long a patient will live with a completely cut spinal cord, but certainly there is no reasons to expect he would live more than a few days to a few years, two or three at the longest, with a completely cut cord.

"Q. Without any hope of final recovery at all. A. None at all.

"Q. Doctor, what was his general physical condition as you looked at him, as being a young man of strength of body. Did you find any evidence of any physical impairment or disease in his body? A. No, sir, except for the effect of his injury and the shock he was in his general condition, appeared to be good. His blood tests were negative, without any syphilitic infection and other general tests indicated that he had been in previous good health.

"Q. A young, normal bodied young man, apparently about twenty-six years old. A. Yes, sir.

"Q. Now, Doctor, taking into consideration the wound on the scalp, of which you spoke, and the crushing of these vertebrae and complete breaking of the back bone and the tearing of the spinal cord in two, can you say whether or not in your opinion that injury was the result of violence. A. The result of violence, force, it would require that to break the spine.

"Q. Could it have resulted or been occasioned by an injury occurring to the patient while riding in an automobile which was collided with by another rapidly moving automobile so as to turn the automobile in which the patient of plaintiff was riding, over.

"The Court: Is there any question about the condition he is in now, proximately resulting from the collision?

"Mr. Hume: No, sir.

"The Court: I understand then there is no question but his present condition, injury resulted from this automobile collision and accident.

"Mr. Price:

"Q. Have you a bill for your services in this matter? A. Yes, sir.

"Q. What is the amount of your bill for services? A. Five hundred dollars.

"Q. Has that been paid to you? A. No, sir.

"Q. Doctor, come and see this plaintiff now. From what point on his body is the bone broken and he paralyzed? A. From this point, the attachment of the last rib. The nerves coming off above, of course, are intact. You can see it runs around in a direction like this, so his loss of sensation would be lower in front than behind, because the nerve supply comes down. It is about halfway between the pelvic bone and navel, in front. A patient from complete paralysis, may get a sensation of pressure, you can press on it and they will feel the pressure, but he cannot feel the sensation like the pricking of a pin, and you see there is complete paralysis here and muscular also. There are what are commonly known as bed sores or pressure sores, the patient lying in one position and making them on prominent places, and on the hip bone you will notice a large bed sore at that point, and he probably has one on his back and another one on his side. They are due to his not being able to feel or move from time to time and due to the lack of nerve supply. The tissues that have no nerve supply, have no resistance.

"He has no control of his bladder, he simply leaks his urine all the time for the muscles controlling the outgo of urine are paralyzed, and also his bowels the same way, he has no control for the effect is above the leval that controls the rectum and bladder.

"Q. Is this swollen and bloody condition of his feet due to the paralyzed condition and lying in bed? A. It is due to impaired nerve supply and lack of pressure.

"Q. It all comes from this injury? A. Yes, sir.

"Q. How long, Doctor, did you treat him at Vanderbilt Hospital? A. Until September 11, 1926.

"Q. When released from the hospital, was the same general condition he is in now, except as to progress due to time, present. A. Yes, sir. He was having more fever at that time, probably due to infection and the bladder, due to lack of drainage, he was perhaps more acutely well then than now.

"Q. You say the same condition with reference to his bladder and lack of ability to control his urine is also true of his bowels, and his lack of ability to control the passage from his bowels? A. Yes, sir."

The proof also shows, without dispute, that plaintiff has incurred physicians and medical bills amounting proximately to $1400 as the result of his injuries. We do not think the verdict, as reduced by the remittitur, is excessive, and the third assignment of error is overruled.

It results that the judgment of the circuit court is affirmed and judgment will be entered accordingly. The costs of the appeal will be adjudged against the defendant and the sureties on his appeal bond.

Crownover and DeWitt, JJ., concur.